Darrel MARTIN, Appellant,

v.

James DIERINGER, Personal Representative of the Estate of William Charles Martin, Appellee.

No. S–11102.

Supreme Court of Alaska.

March 4, 2005.

---

Thomas R. Wickwire, Law Office of Thomas Wickwire, Fairbanks, for Appellant.

Matthew C. Christian, Borgeson & Burns, P.C., Fairbanks, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

PER CURIAM.

This case involves an estate that remained open for more than seventeen years. William Martin died in 1985. He was survived by two children, Donna, then age fourteen, and Darrel, then age eighteen. His will left everything (after payment of debts and certain expenses) in equal shares to the children, in trust. James Dieringer ("Dieringer" or "PR") was the personal representative, and with his wife Nancy Dieringer, co-trustee of the trust.

The assets of the estate included a house in Fairbanks, a lot on Summit Lake, a motor home, some snowmachines, an escrow, and some life insurance. The net value of the estate was less than $250,000.

Dieringer put all cash generated by the estate in estate accounts when he received it. Under the terms of the trust, the funds were to be distributed as necessary for the children's education at least twice each year. The trust was to terminate when Donna turned twenty-two, and the remainder distributed to the children. Although money was not distributed biannually, Dieringer applied funds to the children's needs. He appears to have performed this aspect of his duties well. He required the children to make budgets and they received substantial funds from the trust for educational purposes.

About the time Donna turned twenty-two, in 1992, the children met with Dieringer. At the meeting he presented them with the option of distributing the remaining assets to them then or leaving the estate open so he

could collect the assets and close the estate at some later time. The children agreed that they preferred the latter option, but Darrel testified that he believed this would mean that the estate would remain open only for a matter of months.

By 1997 the only remaining assets of the estate were the Summit Lake lot, which was subject to a mortgage, and a loan Dieringer had made to a company that he owned a half interest in. The children agreed that Darrel would receive the Summit Lake property and Donna would receive more cash from the estate. Darrel contacted Dieringer a number of times concerning the Summit Lake property and closing the estate. Dieringer informed Darrel that he wanted to buy the Summit Lake property for $15,000. Darrel had received a substantially larger offer for the property and was reluctant to agree to sell to Dieringer at Dieringer's price. When this occurred Dieringer took the position that unless Summit Lake were sold to him he would charge the estate fees for his services. Further, he stated that the proceeds of a $50,000 life insurance policy he and Nancy had received when William died were actually owned by him and Nancy, that they had merely loaned the proceeds to the estate, and that the proceeds would have to be repaid. Darrel was unpersuaded and the parties apparently remained at an impasse for some time. Eventually Darrel became concerned that the Summit Lake property would be foreclosed. Dieringer told him there were insufficient funds in the estate to pay the mortgage, so Darrel loaned the estate $6,700 of his own funds to pay it in March 2000. Darrel expected to be conveyed the property from the estate when the mortgage was paid.

Dieringer used the funds to pay off the mortgage. There was some delay in obtaining the necessary releases and the deed was not transferred to Darrel. Darrel petitioned to have Dieringer removed as personal representative. While the petition to remove was pending, Dieringer took steps to close the estate. After a series of hearings and an aborted settlement agreement, the petition to remove and Dieringer's motion for approval of a final accounting were scheduled for hearing. At that point Darrel filed an independent civil action against Dieringer and sought to have his petition to remove withdrawn. The petition to withdraw was denied, and after an evidentiary hearing and a supplemental evidentiary hearing the master issued extensive findings and conclusions that denied the petition to remove. The master's findings and conclusions were approved by the superior court, which also granted Dieringer's final accounting motion and closed the estate.

The final accounting shows that the estate sold the Summit Lake property to a third party for $30,000. In round numbers and less appraisal costs the final sum was distributed as follows: $16,320 in attorney's fees for Dieringer's counsel, $5,850 in fees for Dieringer's services (pared down from a $49,000 request), and $7,430 as a distribution to Darrel.

Darrel appeals, focusing primarily on the findings that supported the denial of the petition to remove Dieringer. Although the estate has closed and Dieringer is no longer its personal representative, many of the challenges to the master's findings and conclusions may still be important because of the collateral estoppel effect the latter were given in the dismissal of Darrel's separate civil action against Dieringer.[1] Because of this effect and because Darrel's challenge might impact the award of counsel fees and fees to Dieringer, this case is not moot.[2]

On appeal Darrel contends that Dieringer breached his duty as a fiduciary with respect to his rental of the house at what Darrel contends were submarket rates, with respect to his sale of the motor home to his partner, with respect to the loan of estate funds to a company half-owned by Dieringer, and with respect to his efforts to buy the Summit Lake property at submarket rates. Darrel further challenges the master's finding that

**1.** *Martin v. Dieringer*, Mem. Op. & J. No. 1203 (Alaska, March 4, 2005).

**2.** *Cf. City of Valdez v. Gavora, Inc.*, 692 P.2d 959, 960–61 (Alaska 1984) (where appeal had become moot, not reaching merits but vacating judgment, to prevent judgment from having collateral effects).

the $50,000 in life insurance proceeds received by James and Nancy Dieringer in 1985 on account of William Martin's death were the property of the Dieringers rather than trust property for the children.

We conclude that the master's findings concerning the house and the motor home are supported by the evidence and are not clearly erroneous. But the master's findings concerning the loan, the Summit Lake transaction, and the $50,000 life insurance policy are erroneous, as explained in the following paragraphs.

Darrel presents seven primary arguments. We summarize each below together with our decision concerning it.

**ARGUMENT I**

Darrel argues that numerous findings made by the probate master and adopted by the superior court are erroneous. We conclude that several of the findings are erroneous.

**Findings 21 through 25**

Findings 21 through 25 are clearly erroneous. These findings have to do with an $8,000 loan made by the estate. The master found:

21. The estate made a loan of $8,000 to a company called AEC. Without being asked, PR volunteered the information that he was a shareholder in AEC Corp. The AEC loan was documented with a Promissory Note. The note was unsecured and was set at an interest rate that was equal to the savings account rate that the money was earning at the bank at that time. The loan was paid back in full. This loan clearly involved a conflict of interest between the estate and the PR.

22. A.S. 13.16.400 Sale, encumbrance, or transaction involving conflict of interest voidable; exceptions provides [sic] as follows:

Any sale or encumbrance to the personal representative, the personal representative's spouse, agent, or attorney, or any corporation or trust in which the personal representative has a substantial beneficial interest, or any transaction which is affected by a substantial conflict of interest on the part of the personal representative, is voidable by any person interested in the estate except one who has consented after fair disclosure, unless

(1) the will or a contract entered into by the decedent expressly authorized the transaction; or

(2) the transaction is approved by the court after notice to interested persons.

There is no statutory requirement for a personal representative to seek court approval to do a "conflict of interest" sale or loan. However the penalty for failing to do so is set out in the statute as is the procedure to obtain approval and the procedure for asking that the loan be voided. It does not appear that petitioner is requesting that either transaction be voided at this time.

23. The only credible testimony before the court is that the interest rate on the note to AEC was at the rate of 6% and it was paid back in full with all interest that was owing.

24. Although technically a conflict of interest transaction, the evidence before the court indicates that the loan to AEC was an arm's length transaction documented by a Promissory Note and paid back in full. The 6% interest rate equaled the bank rate and as such was a comparable transaction and caused no harm to the estate. The interest rate on the AEC loan was 6% and all sums appear to have been paid in full. There is no harm to the estate from the transaction.

25. Occasional payments on the Summit Lake property were technically delinquent. However, PR testified that the note payments were allowed to be delayed. In all actuality, PR should not have distributed money to the heirs that they had requested. This distribution to the petitioner and his sister caused the estate to be in a cash poor situation which situation caused the delinquency. Petitioner and his sister should have understood that as payments came in from the house and other sources that the Summit Lake property would be paid.

◼ The master's conclusion that the loan was an arm's length transaction and that it caused no harm to the estate is clearly erroneous. Dieringer's loan to his own company was a breach of his fiduciary duty to the trust and not an arm's length transaction. The "bank rate" of six percent was the rate banks paid at the time on savings accounts, not the rate at which they loaned money, and thus was a preferential benefit to AEC. The loan caused harm to the estate. The last undisposed asset held by the trust was property on Summit Lake. There was an initial $13,000 debt on the property, bearing a twelve percent interest rate. The $8,000 loaned to AEC could have been applied to the remaining debt on the Summit Lake property, discharging part of the twelve percent obligation.

### Findings 42 and 43

Findings 42 and 43 are clearly erroneous. These findings concern the alleged $50,000 loan that Dieringer claims to have made to the estate. In Finding 26, the master found that the petitioner "does not dispute that PR and Nancy Dieringer put $50,000 into the estate." The master addressed this subject in Findings 42 and 43 stating:

42. It was reasonable for the PR to leave the estate open and continue to manage the affairs of the estate. It was understood that decedent's estate at the time of his death was not in financially good condition. In fact, PR had to loan the estate $50,000 in order to allow the estate the liquidity it needed so that Donna and petitioner could have funds to attend college.

43. PR did testify at the hearing and it is true that he and Nancy Dieringer received life insurance proceeds payable to them individually in the amount of $50,000 which policy was purchased by decedent. This money passed to PR and Nancy Dieringer outside of the estate and per the insurance policy between decedent and the insurance company.

◼ The evidence does not sustain the finding that the $50,000 life insurance payment was intended to be the individual property of the Dieringers as distinct from property that passed to them for the benefit of the Martin children.[3] The Dieringers were not relatives, business partners, or associates of William Martin, and were not the natural object of William's beneficence. Upon receiving the $50,000 insurance payment shortly after the death of William Martin in 1985, Dieringer paid it into the estate. He made no claim that it was a loan until fourteen years later, in approximately 1999, when this dispute arose. Even then Dieringer's claim was equivocal in nature. His attorney, upon opening statement, suggested that reimbursement for the $50,000 would only be sought by Dieringer if he were removed as personal representative. When asked by his counsel "would you characterize that as a loan?" Dieringer answered "I will today, yes." He explained that what he meant by "today" was that he could "forgive some of that loan." He was asked on cross-examination: "Are you reserving your position from what you do with that loan depending on what Mr. Martin does in this court proceeding?" His answer was "Possibly." Given the fact that there was no reason for William Martin to leave property to the Dieringers except to benefit his children, for whom they were trustees, and the contemporaneous treatment by Dieringer of the $50,000 in 1985 by contributing it to the estate with no indication that it was merely a loan until the dispute arose fourteen years later, the court clearly erred in concluding that the $50,000 was individually owned by the Dieringers.

◼ This conclusion is supported by the general rule concerning gifts to executors that "unless the intention to benefit the executor personally is clearly expressed, it will ordinarily be assumed or presumed that the gift was to the executor in his fiduciary capacity...."[4] No intention contrary to this presumption was expressed in this case.

---

3. Notwithstanding the master's findings that the $50,000 life insurance proceeds were the individual property of the Dieringers, it does not appear from the final accounting that this amount was repaid or approved for repayment from the estate to the Dieringers.

4. R.A. Horton, Annotation, *Testamentary Gift to Executor as One in His Fiduciary Capacity or in*

## Findings 27 through 33

Findings 27 through 33 are clearly erroneous. In these findings the master addressed the situation that arose with regard to the Summit Lake property. The master found:

27. PR never refused to convey the Summit Lake property to petitioner after he made the $6,700 payment. PR used those funds to pay off the note on Summit Lake and proceeded with getting the Deed of Reconveyance executed. He retained the services of legal counsel to do that. Petitioner became impatient with the time that it was taking the legal counsel to complete the transaction.

29.[sic] At one point PR was told by petitioner that he intended to keep the Summit Lake property. PR apparently told petitioner if he ever wanted to sell the property, he would like to buy it.

30. In determining what shares petitioner and his sister would receive from the estate, at a meeting between them, PR, petitioner and petitioner's sister, Donna Martin, had agreed that the value of the Summit Lake property was $15,000. PR, apparently at this time, does not wish to purchase the Summit Lake property and believes it needs to be sold to pay the debts of the estate at the highest value possible. The parties seem to agree this is in excess of $15,000 and in fact there is a court order for the property to be sold at appraised value but not less than $25,000 entered by the court 11/30/01 in this case.

31. The payments to the Summit Lake property were deferred; and although they were technically delinquent, PR did not view them as delinquent as he had obtained permission to defer payments from the seller, Joseph D. Lanni. Petitioner believed that the $6,700 he reimbursed to PR would pay off the balance on this note and that PR would convey the Summit Lake property to petitioner.

32. At one point in the dealings between petitioner and PR, the PR demanded that he be allowed to purchase the Summit Lake property at the price which had been given it in the "share of the estate" meeting which was held with PR, petitioner and Donna Martin. Petitioner had received an offer from a third party to purchase the Summit Lake property for $23,000. Petitioner testified that PR told him that the decedent had expressed his desire to sell the Summit Lake lot to PR if neither of the decedent's children wished to remain in Alaska. This evolved into a significant dispute between PR and petitioner which caused much hard feeling between them and significant breakdown in their communications and understanding of communications made between them. All of this resulted in the dispute which is now before the court.

33. As stated above, PR most likely should not have distributed as much cash to petitioner and Donna Martin but instead used those funds to pay off the Summit Lake property. If any harm to the estate occurred by his premature distributions, it resulted in the benefit to the heirs of their use of the funds at a time they apparently had requested and were in need of the funds. It is unclear therefor if there was any breach of fiduciary duty and since this issue is unclear, the preponderance of evidence standard would dictate that the court can find no breach of fiduciary duty regarding this issue. Even were there to be findings of some breach of fiduciary duty, there is insufficient evidence in the record to determine the extent of damage to the heirs of the estate.

The finding that there was no breach of fiduciary duty is clearly erroneous. When asked by opposing counsel whether Darrel's refusal to sell him the Summit Lake property for $15,000 was the reason he decided to charge the estate fees, Dieringer responded, "I'm sure that had an influence on my decision, yes." Dieringer testified that he had not decided what he would do concerning the $50,000 life insurance money at the time he put it into the estate. He also testified that he first told Darrel the money had to be repaid during the discussion about the Summit Lake property, after Darrel refused to sell the property to him for $15,000.

*His Own Right,* 3 A.L.R.3d 1376, 1380 (1965).

■ Dieringer's "demand" that he be allowed to purchase a trust asset for less than fair market value and the threats he made in conjunction with this demand were self-dealing and a breach of his fiduciary duty.

### Finding 39

Finding 39 was based on a legal error about the extent of the superior court's discretion to control the appointment of a personal representative to replace Dieringer. The master determined that Nancy Dieringer, who was named as the successor personal representative in the will, would have the next priority of appointment if Dieringer were removed. But it would be within the court's discretion not to appoint Nancy as the successor personal representative.[5] If Dieringer were removed for conflicts of interest, Nancy probably would not have been an appropriate successor given that she would also have many of the same conflicts.

### Finding 52

Finding 52 is clearly erroneous. This finding stated:

This PR did little if anything contrary to the will and little if anything that could be construed as substantial harm to the estate that would require his removal as PR in light of the facts and circumstances listed in these findings. There is no credible evidence in the record to indicate bad faith on the part of PR in administering this estate or in defending his position in these proceedings.

Our discussion of Findings 21–25, 42 and 43, and 27–33 indicates that Dieringer breached his fiduciary duties as a trustee. He engaged in self-dealing when he made a loan with the estate assets to a company in which he had an interest. He improperly, albeit equivocally, claimed that the $50,000 life insurance proceeds were his individually rather than as trustee, and he engaged in self-dealing when he attempted to purchase the Summit Lake property for less than fair market value. These breaches were intentional and are equivalent to bad faith.[6]

### ARGUMENT II

Darrel argues that the master erred in failing to remove Dieringer as the personal representative of the estate. Although we agree that there were grounds under which Dieringer could have been removed, we conclude that the master did not err in recommending nonremoval given that the estate was ready to be closed by the time the petition to remove was decided.

### ARGUMENT III

Darrel argues that the master erred in Finding 36 that there was no bad faith on Dieringer's part as personal representative. For the reasons already indicated with respect to Dieringer's breaches of fiduciary duty and his claim of trust property as his own, we agree that this finding is clearly erroneous.

### ARGUMENT IV

Darrel makes an evidentiary argument concerning the exclusion of testimony. We find no abuse of discretion.

### ARGUMENT V

Darrel raises a statute of frauds argument concerning the apparent agreement of the beneficiaries to extend the continuation of the trust. It appears that this point was not raised below and it is therefore waived.

### ARGUMENT VI

Darrel challenges the award of $16,320 in attorney's fees and $5,850 award of personal representative fees. In light of our conclusion that the court clearly erred with respect to failing to find that Dieringer had committed breaches of fiduciary duties and acts of bad faith, we vacate these awards and remand the fee issues for reconsideration.

### ARGUMENT VII

Darrel argues that the court erred in failing to allow him to withdraw his petition to remove the personal representative. We conclude that there was no error because the petition to withdraw was untimely.

5. *See* AS 13.16.305.

6. *See* BLACK'S LAW DICTIONARY 108 (Abridged 7th ed.2000).

## CONCLUSION

For the foregoing reasons, we VACATE as erroneous in the respects indicated Findings 21–25, 42 and 43, 27–33, 36, 39, and 52, VACATE the award of attorney's fees and personal representative fees, and REMAND this case for reconsideration of attorney's fees and fees of the personal representative in light of the conclusions expressed herein.