*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| In the Matter of the Necessity for the Hospitalization of | ) ) ) | Supreme Court No. S-13764 |
| STEPHEN O. | ) ) | Superior Court No. 1JU-10-00020 PR |
| | ) ) | O P I N I O N |
| | ) ) | No. 6857 – December 17, 2013 |
| | ) | |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Juneau, Patricia A. Collins, Judge.

Appearances: Michael Schwaiger, Assistant Public Defender, and Quinlan G. Steiner, Public Defender, Anchorage, for Appellant. John W. Erickson, Jr. and Laura Fox, Assistant Attorneys General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee.

Before: Carpeneti, Chief Justice, Fabe, Winfree, Stowers, and Maassen, Justices.

STOWERS, Justice.
CARPENETI, Chief Justice, with whom FABE, Justice, joins, dissenting.

I.      INTRODUCTION

Parents of a man who were concerned that he had suffered a possible psychotic break reported his behavior to a mental health clinician in Haines. The clinician obtained an ex parte order to take the man into custody and transport him to the hospital in Juneau for examination and treatment. Haines police took him into custody,

but due to bad weather he remained in the Haines jail for six days before he was transported to Juneau for evaluation. After a contested hearing, the superior court found by clear and convincing evidence that the man was gravely disabled under AS 47.30.915(7)(B) and issued an order for a 30-day involuntary commitment. The man appeals the order for involuntary commitment. Because the superior court's conclusion that the man was gravely disabled was not supported by clear and convincing evidence, we reverse and vacate the superior court's 30-day involuntary commitment order.

## II. FACTS AND PROCEEDINGS

### A. Facts

Shortly after Christmas 2009 Stephen O.[1] experienced what he believed to be a religious conversion and, as he described it, "got [his] relationship back" with Jesus. In the weeks leading up to the holiday that year, Stephen had been "a little nervous" because his children were about to depart for a visit to their mother in Seattle for their Christmas vacation, the first Christmas he had spent without the children in a decade. Stephen and his wife of eleven years had separated in May 2009, when she left their home in Haines to live with her mother. Following the separation, Stephen had been attempting to "rebuild[] the trust" in their relationship for the benefit of their two children, who had been living with Stephen in Haines since August 2009.

Stephen testified that when the children returned from their visit shortly after Christmas, he began to hear the voice of Jesus speaking to him, telling Stephen that his sins were forgiven and he should "get on a path of repentance." According to Stephen, Jesus told him to go to church and, in particular, to talk to a neighbor across the

---

[1] We use pseudonyms to protect Stephen's privacy.

street who attended a Pentecostal church. Stephen visited and prayed with the neighbor, who put Stephen in touch with his pastor. The pastor invited Stephen to attend his church.

Around this same time, Stephen's father became concerned about him after Stephen's 12-year-old daughter reported that Stephen's behavior was "creeping her out."[2] Stephen had awakened his daughter at night and talked to her about Jesus, going to church, and following "a path of repentance." Stephen's father and daughter were alarmed because they believed Stephen's behavior was similar to behavior he had exhibited about six years earlier, in 2004, when he heard voices that led him to jump off a ledge approximately 16 to 18 feet high. He broke his ankle, gashed his head, sustained a concussion, and was temporarily wheelchair-bound as a result. This incident occurred at a hospital in Olympia, Washington; Stephen had been taken to the hospital by members of a church after he asked them to take him to a doctor because he was experiencing "total fear" as a result of hearing voices. Following this incident, Stephen was prescribed Resperdal, an antipsychotic medication, which he took for approximately one to two years. Stephen also began receiving Social Security disability benefits for psychiatric illness.

On January 8, 2010, a petition for initiation of involuntary commitment was filed at the prompting of Stephen's family members. The petition for commitment alleged that Stephen had been "presenting with psychotic features" and exhibiting behaviors "similar to those he has exhibited in the past, prior to a suicide attempt."

---

[2] Neither Stephen's father nor his daughter testified at the hearings in the superior court. Instead Stephen's father reported his reasons for seeking involuntary commitment to Dr. John Pappenheim, Stephen's examining psychiatrist at Bartlett Regional Hospital, who relied on them in his diagnosis.

Specifically, the petition alleged that Stephen had been "hearing the voice of Jesus." On the basis of this allegation, the Haines Police Department took Stephen into emergency custody under AS 47.30.705(a).[3] The following day, Master Bruce Horton of the Sitka Superior Court issued an ex parte order to have him taken into custody and transported to Bartlett Regional Hospital in Juneau, "the nearest appropriate evaluation facility," for an evaluation as provided for in AS 47.30.710(a).[4] Stephen was taken to the Haines jail. He remained there from January 8 to January 14 because bad weather prevented his transportation to Juneau for evaluation. He arrived at Bartlett Regional Hospital on

---

[3]     Alaska Statute 47.30.705(a) provides in relevant part:

> A peace officer, a psychiatrist or physician who is licensed to practice in this state or employed by the federal government, or a clinical psychologist licensed by the state Board of Psychologist and Psychological Associate Examiners who has probable cause to believe that a person is gravely disabled or is suffering from mental illness and is likely to cause serious harm to self or others of such immediate nature that considerations of safety do not allow initiation of involuntary commitment procedures set out in AS 47.30.700, may cause the person to be taken into custody and delivered to the nearest evaluation facility. A person taken into custody for emergency evaluation may not be placed in a jail or other correctional facility except for protective custody purposes and only while awaiting transportation to a treatment facility.

[4]     Alaska Statute 47.30.710(a) states:

> A respondent who is delivered under AS 47.30.700 - 47.30.705 to an evaluation facility for emergency examination and treatment shall be examined and evaluated as to mental and physical condition by a mental health professional and by a physician within 24 hours after arrival at the facility.

-4-                                                   6857

January 14, 2010, and was evaluated the next day by Dr. John Pappenheim, the medical director for psychiatric services. On January 20 Elizabeth Ziegler, a court-appointed visitor, met with Stephen and issued a two-page report concerning his condition. The report stated that Stephen "was friendly and presented well." The report also described Stephen's concerns about taking psychotropic medication; according to the report, Stephen stated he did not need medication because he believed he was healthy, but that "if the court ordered him to take medication he would not harm people and would take an injection." The report also summarized a conversation Ziegler had with Stephen's mother concerning his mental health history and current condition.

**B.    Proceedings**

On January 20, 2010, Superior Court Judge Patricia A. Collins conducted a 30-day commitment hearing. At the outset, the court explained that it had not been able to read the entirety of Ziegler's report before the hearing. Further, the court noted that Stephen's attorney had been appointed only one day before the hearing, which the court acknowledged did not give him "a lot of opportunity to follow up with the information that ha[d] been presented."

The court heard testimony from both Dr. Pappenheim and Stephen. Much of the testimony focused on Stephen's 2004 episode; as Dr. Pappenheim explained, "in substantial part, my diagnosis and my concern in this case are derived from the history that I have obtained from [Stephen's] father," who stated that during the 2004 episode Stephen had "behaved in precisely the same fashion that he's behaving now," namely that he had been "hearing the voice of Jesus telling him that he was heading down a path of repentance." Dr. Pappenheim also testified that he spoke with Stephen about the 2004 episode and that Stephen told him he had felt "extremely fearful" during that episode and heard the voice of Lucifer, who he believed was threatening him. Dr. Pappenheim

acknowledged that in the present instance there was nothing to suggest that Stephen was feeling fearful, depressed, or suicidal. Dr. Pappenheim also acknowledged that he had not been able to compare the information gleaned from his interviews with Stephen and his father with Stephen's medical records from the 2004 episode, explaining that he had not "had a chance" to obtain the medical records from the Olympia, Washington hospital where Stephen had been treated.

Stephen testified that during the 2004 episode he felt "total fear" and "knew something was not right." He explained that this fear motivated him to ask to be taken to the hospital to seek treatment. By contrast, in discussing his current condition, Stephen testified that he did not feel any fear or distress. Rather, he stated that he felt optimistic about the future and happy that Jesus had forgiven his sins. In response to a question concerning Dr. Pappenheim's testimony that Stephen had an irrationally positive view of his circumstances, Stephen responded, "If he's thinking that I don't know the situation, that I'm happy about the things that are going on, well, no, I'm not happy about certain things. . . . I couldn't even talk to my kids for the first week [in custody], you know? I miss them. I love them."

Stephen also testified concerning his religious background. He testified that he had previously attended and been baptized at a Pentecostal church in Cordova, though he had not attended church since moving to Haines. He stated that his parents did not raise him to be religious, but that he had believed "in [the] Lord Jesus Christ with all [his] heart" since he was ten years old. Stephen explained that his father had never been "real religious" and that in the past they had disagreed over religion, but he also stated that he "love[d]" his father, and that he understood his father was "concerned" about him. Stephen also described an altercation he had with his brother shortly before he was taken into custody in January 2010. Stephen testified that he was at home praying when

his brother "just barged in and said [some] awful things," including that Stephen was "bad for loving Jesus" and that Stephen was going to go "back to the hospital" and they would "never let [him] out." Stephen tried to avoid a confrontation with his brother and went outside, where his brother followed him and threw him to the ground. Stephen then went back into his home, where he picked up his Bible. His brother "said something bad about Jesus" and then tried to take the Bible from Stephen. After a struggle, his brother again knocked Stephen to the ground.

With respect to Stephen's religious background, Dr. Pappenheim testified that Stephen's father had "mentioned very briefly in passing that he wasn't particularly religious," but the doctor did not know how Stephen's father felt in general about people who are religious, nor did he know if the father had any bias or prejudice against religious practice or belief. Dr. Pappenheim acknowledged that he never "specifically asked" Stephen whether Stephen identified with any particular religious group. The doctor also acknowledged that his familiarity with the Pentecostal religion with which Stephen had been associated was "[v]ery superficial" and, when asked if Pentecostalism has any "born-again characteristics," Dr. Pappenheim replied "I couldn't tell you." With respect to Stephen's belief that Jesus was speaking to him, Dr. Pappenheim testified that he believed Stephen's belief was not genuine but instead was "delusional." Dr. Pappenheim explained:

> A delusion is a belief that is arrived at by other than rational means which is not subject to change by the normal means of logic and persuasion. Now, if somebody had a religious belief that they grew up with that was part of their culture, that is considered a rational means for that belief. However, in [Stephen's] case, the religiosity that he manifested started five years ago and led him to behave in a way that was substantially dangerous to himself, and could have killed him. And it doesn't come from a cultural, historical context. It

comes out of the blue. It's not there on a persistent basis. It disappeared for a number of years. And now it has returned again. All of that is consistent with something outside of religiosity and that falls into the category of delusions.

Dr. Pappenheim also testified concerning his observations of Stephen's current psychiatric condition, stating that "[Stephen] has a distinctively and abnormally persistent elevation, or expansiveness[,] of mood that's the singular feature of bipolar disorder." Dr. Pappenheim explained that Stephen's "very elevated . . . if not modestly euphoric mood" was indicative of a problem because it was not congruent with the circumstances of Stephen's unfortunate situation:

> [I]t's this . . . completely illogical, irrational response of everything's great [despite the fact that he's being held against his will, that] his children are no longer with him, and that his father thinks that he has a mental illness that needs to be treated, and that the psychiatrist that's been appointed to work with him thinks that he has a mental illness that needs to be treated, and that [the psychiatrist] thinks he should take medication and [Stephen] doesn't want to take medication.

Dr. Pappenheim explained further that Stephen was incapable of making a decision about voluntary treatment because he was operating under the belief that he does not have a mental illness.

According to Dr. Pappenheim, Stephen's inability to understand his situation and refusal to accept treatment for it constituted grave disability. The doctor testified that Stephen refused to take a mood stabilizer and an antipsychotic,[5] which Dr. Pappenheim believed were "requisite treatment[s]" for someone with manic psychosis. According to Dr. Pappenheim, Stephen objected to taking psychotropic

---

[5] However, as noted above, Ziegler stated in her visitor's report that Stephen agreed to take medication if ordered to do so by the court.

medicine primarily because it made him feel "somehow not like himself, not in touch with [his] feelings" and because he believed such medication would interfere with his ability to hear Jesus' voice. Dr. Pappenheim testified that without treatment, Stephen was at risk of hurting himself as he had during the 2004 episode, because "[p]ast patterns of behavior are really the only good predictors of future behavior." Dr. Pappenheim acknowledged that there were no current allegations that Stephen had failed to care for his children. But Dr. Pappenheim explained that Stephen's refusal to accept treatment "places him in substantial danger of deteriorating condition, the development of a chronic psychotic process, [and] the risk of . . . harming himself."

Dr. Pappenheim's main concern was that, if Stephen were allowed to leave the hospital, Stephen's condition would "persist and worsen, [and] that he would at one point listen to a voice that would tell him to do something . . . very dangerous and self harmful." Dr. Pappenheim explained that without treatment Stephen's condition was "not going to abate" and "there [would] be a chronic worsening" that may develop into "a chronic psychotic process." Ultimately, Dr. Pappenheim concluded that there was no less restrictive alternative to a 30-day commitment to ensure Stephen's safety and provide him with requisite care.

Following this testimony the superior court prefaced its findings by observing that this was "an extremely difficult case" and by acknowledging the "very high burden of proof that applies in this case[,] . . . clear and convincing evidence." The court then summarized its observations of Stephen's current condition. The court observed that Stephen was appropriately dressed and groomed, looked as though he was eating well, and overall appeared to be in better condition than the typical respondent in

a commitment hearing.[6] The court also observed that it was "commendable" that Stephen had sought psychiatric care during his psychotic episode in 2004 and had "worked with [his] family" to address his mental health difficulties. Finally, the court observed that, prior to his present commitment, Stephen had taken "responsibility for . . . the care and feeding of [Stephen's two] children" and had been able to "provide for those needs."

The court then proceeded to summarize the evidence in favor of granting the commitment. First, the court reviewed the circumstances in which Stephen came to be committed, focusing in particular on the comment by Stephen's daughter that Stephen's behavior was "creeping her out." The court seemed to regard this as an important factor, but also suggested that the statement was ambiguous and expressed regret that it had not heard testimony from the daughter herself on this matter: "Maybe that was just an inappropriate comment by a 12-year-old, unrelated to . . . appropriate religious beliefs you hold. But I guess I put a lot of emphasis on that. And frankly, wish I could hear more from her about what drove her to that conclusion. But, I mean, I have to look at all the facts."

Second, the court noted:

We've got the prior psychiatric break, a hospitalization, and what appears to have been a suicide attempt, in response to a perceived conversation with — I'm not sure if it was Jesus or Lucifer. Depends on who you talk to, I guess, in terms of who that conversation was with. But that occurred when there was no prior evidence of any particular strong religiosity. Maybe there had been, but I hadn't heard that, other than that you've cared about Christ since you were 10.

---

[6] Similarly, as noted above, the court-appointed visitor described Stephen as "friendly and present[ing] well," and Dr. Pappenheim acknowledged that Stephen "can carry on a very rational conversation on day-to-day topics."

And — but I also heard you say that, you know, you haven't regularly attended church.

Third, the court observed that "there's both a prior and current diagnosis of bipolar disorder with psychotic features" and that Stephen had been "found eligible in a stringent test by Social Security disability for receipt of benefits due to [a] psychiatric condition."

Finally, the court relied on "the testimony [from Dr. Pappenheim] that [Stephen] believe[s] that Jesus is telling [him] that [he does not] need mental health help."

Following this, the court concluded that "the issue before me today is one that is such that I am going to grant the petition for hospitalization. It does not mean I am necessarily going to grant a request for involuntary medication. And it also doesn't mean that I would not be open to hearing additional testimony" from Stephen's daughter or other persons "about exactly what was going on there in Haines that resulted in this situation." Nevertheless, the superior court found that Stephen was "gravely disabled" under AS 47.30.915(7)(B) and ordered that Stephen be involuntarily committed for 30 days.

Later, the superior court heard additional testimony on the petition to involuntarily administer psychotropic medication. In the interim, Dr. Pappenheim received records from the hospital in Olympia where Stephen was treated in 2004. Dr. Pappenheim testified that he was "surprised" by the assessment because it described "a presentation that is . . . much more overt and disturbing than that which we see today." The doctor elaborated that there was "much greater evidence of illness from their description than what I have seen" in Stephen's current behavior. The doctor testified, however, that the records strengthened his opinion that Stephen's current hospitalization was appropriate "because of the markedly regressed psychotic state that [Stephen]

came . . . in with [in 2004] and [his] concern that . . . he would return to that at some point."

The superior court denied the petition to administer medication, concluding that there was not clear and convincing evidence that harm to Stephen was imminent because his mental condition had not deteriorated during the time he was in custody. The court nevertheless continued the 30-day commitment order, finding that Stephen was still gravely disabled.

On January 29, 2010, Stephen was discharged early because the State's petition to involuntarily administer medication was denied, Stephen refused to take medication voluntarily, and "gains [would] not be achieved without medication."

Stephen appeals the order for involuntary commitment and requests that it be vacated.[7]

## III.    STANDARD OF REVIEW

We apply our independent judgment to the interpretation of the Alaska Constitution and statutes, adopting "the rule of law that is most persuasive in light of precedent, reason, and policy."[8]    Factual findings in involuntary commitment proceedings are reviewed for clear error, and we overturn these findings only where a review of the record leaves us "with a definite and firm conviction that a mistake has been made."[9]    Whether factual findings comport with the requirements of AS 47.30

---

[7]    Stephen also argues that his extended detention before evaluation at a hospital violated his rights to due process and equal protection of the law.  We do not reach these issues on appeal because Stephen waived them at trial.

[8]    *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 375 (Alaska 2007) (quoting *Guin v. Ha*, 591 P.2d 1281, 1284 n.6 (Alaska 1979)).

[9]    *Id.* (citing *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family* (continued...)

presents a legal issue, which we review de novo.[10]

## IV. DISCUSSION

### A. Stephen's Appeal Is Not Moot.

Stephen argues on appeal that the superior court erred when it found him "gravely disabled." We asked for supplemental briefing on whether Stephen's claim is moot. The hospital released Stephen before the order for commitment had expired because the hospital had not been authorized to administer medication. Although the superior court denied the petition to administer medication, it did not vacate its finding that Stephen was gravely disabled. Stephen now seeks to vacate the superior court's order for commitment.

Stephen's evidentiary challenge to the superior court's finding that he was "gravely disabled" would be moot under the standard we established in *Wetherhorn v. Alaska Psychiatric Institute*.[11] However, in *In re the Hospitalization of Joan K.*, we adopted the collateral consequences exception to mootness in the involuntary commitment context.[12] The collateral consequences exception "allows courts to decide otherwise-moot cases when a judgment may carry indirect consequences in addition to

---

[9]    (...continued)
*& Youth Servs.*, 79 P.3d 50, 53 (Alaska 2003)).

[10]    *Id.*

[11]    156 P.3d at 381 (holding that the public interest exception to mootness does not apply to an evidentiary challenge to an involuntary commitment that has since expired).

[12]    273 P.3d 594, 597-98 (Alaska 2012). Stephen's appeal preceded Joan K.'s appeal, but Stephen's appeal was deferred after we invited supplemental briefing on the mootness question. In the meantime, we issued our opinion in *Joan K.*

its direct force, either as a matter of legal rules or as a matter of practical effect."[13] Among the collateral consequences we considered were "social stigma, adverse employment restrictions, application in future legal proceedings, and restrictions on the right to possess firearms."[14] These general collateral consequences also apply to a person who has previously been voluntarily hospitalized for psychiatric reasons.[15] Collateral consequences flow from the judicial classification that forms the basis of an involuntary commitment order.[16] An individual's choice to voluntarily seek psychiatric care does not diminish the collateral consequences of a later court order that commits him against his will.

We held in *Joan K.* that "there [were] sufficient general collateral consequences, without the need for a particularized showing, to apply the doctrine in an otherwise-moot appeal from . . . a person's first involuntary commitment order."[17] In this case, Stephen and the State stipulated that Stephen's previous hospitalization in Washington was voluntary.[18] Thus, because this is Stephen's first *involuntary*

---

[13]     *Id.* at 597-98 (footnote omitted).

[14]     *Id.* at 597 (footnotes omitted).

[15]     *See, e.g.*, 18 U.S.C. § 922(g)(4) (2012) (criminalizing possession of firearms by individuals who have been committed to a  mental institution).

[16]     *Joan K.*, 273 P.3d at 608 (Stowers, J., dissenting) ("[I]n this age of prevalent information mining, collection, and storage into increasingly large, interconnected, and searchable data banks, the fact that a citizen has been involuntarily committed to a mental institution will follow that individual for all of her life.").

[17]     *Id.* at 598.

[18]     While Stephen and the State agree that we should consider the merits of Stephen's challenge, they disagree about which party should bear the burden of establishing whether a patient has previously been subject to involuntary commitment.
(continued...)

commitment order, we do not require a showing of particularized consequences resulting from the superior court's finding that he was gravely disabled. Sufficient generalized collateral consequences flow from this judicial determination to allow us to reach the merits of Stephen's appeal.

**B.      The Superior Court Erred In Finding That Stephen Was Gravely Disabled Based On Evidence Offered At Stephen's January 20, 2010 Commitment Hearing**.

Stephen argues that the factors the court relied upon in making its determination that he was gravely disabled "even taken together" do not provide "clear and convincing evidence" that he was gravely disabled. We agree.

Under AS 47.30.735(c), a court may involuntarily commit a person to a treatment facility for up to 30 days if the court finds by clear and convincing evidence that the person is "mentally ill" and as a result is either "likely to cause harm to [himself] or others or is gravely disabled." The "clear and convincing"standard of proof required by the statute demands "a firm belief or conviction about the existence of a fact to be proved."[19] "Clear and convincing evidence has been characterized as evidence that is greater than a preponderance, but less than proof beyond a reasonable doubt."[20] As we explained in *Wetherhorn v. Alaska Psychiatric Institute*, requiring this heightened standard of proof in involuntary commitment cases "is one way to impress the factfinder with the importance of the decision and thereby perhaps to reduce the chances that

---

[18]      (...continued)
But because the parties stipulated that Stephen's previous hospitalization was voluntary, we do not decide this issue.

[19]      *In re Johnstone*, 2 P.3d 1226, 1234 (Alaska 2000) (quoting *Buster v. Gale*, 866 P.2d 837, 844 (Alaska 1994)).

[20]      *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 88 P.3d 527, 530 n.12 (Alaska 2004) (quoting *Buster*, 866 P.2d at 844).

inappropriate commitments will be ordered."[21]  Such caution is required in involuntary

commitment cases because of the great "importance of the liberty right involved" and the

"massive curtailment of liberty" that such commitments entail.[22]  We reaffirmed these

principles in *In re Tracy C.*, where we observed that "our decision in *Wetherhorn . . .*

emphasized the high standard required to justify . . . involuntary commitment."[23]

Stephen's involuntary commitment was executed under the "gravely

disabled" prong of AS 47.30.735(c).  Alaska Statute 47.30.915(7)(B) defines "gravely

disabled" as:

> [A] condition in which a person as a result of mental illness
>
> . . .
>
> will, if not treated, suffer or continue to suffer severe and
> abnormal mental, emotional, or physical distress, and this
> distress is associated with significant impairment of
> judgment, reason, or behavior causing a substantial
> deterioration of the person's previous ability to function
> independently.

In *Wetherhorn,* we concluded that "in order to be constitutional, AS 47.30.915(7)(B)

must be construed so that the 'distress' that justifies commitment refers to a level of

incapacity that prevents the person in question from being able to live safely outside of

---

[21]     *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 377 n.26 (Alaska 2007) (quoting *Addington v. Texas*, 441 U.S. 418, 427 (1979)).

[22]     *Id.* at 375-77 (quoting *Humphrey v. Cady*, 405 U.S. 504, 509 (1972); citing *O'Connor v. Donaldson*, 422 U.S. 563, 567 (1975)).

[23]     *In re Tracy C.*, 249 P.3d 1085, 1092 (Alaska 2011) (citing *Wetherhorn*, 156 P.3d at 378); *see also Joan K.*, 273 P.3d at 602-608 (Stowers, J., dissenting) (discussing the role of the clear and convincing standard in involuntary commitment cases).

a controlled environment."[24]  We explained that

> [t]his construction of the statute is necessary not only to protect persons against the massive curtailment of liberty that involuntary commitment represents, but also to protect against a variety of dangers particular to those subject to civil commitment.  For example, there is a danger that the mentally ill may be confined merely because they are physically unattractive or socially eccentric or otherwise exhibit some abnormal behavior which might be perceived by some as symptomatic of a mental or emotional disorder, but which is in fact within a range of conduct that is generally acceptable.[25]

The superior court cited the following facts in support of its conclusion that Stephen was gravely disabled:  (1) Dr. Pappenheim's recollection of Stephen's father's statement that Stephen's 12-year-old daughter complained Stephen was "creeping her out"; (2) Dr. Pappenheim's discussion of the similarities between Stephen's 2004 prior psychotic break, hospitalization, and apparent suicide attempt as recounted by Stephen's father; (3) Stephen's diagnosis of bipolar affective disorder, current manic with psychotic features, and his eligibility for and receipt of Social Security disability benefits for a psychiatric condition; (4) Dr. Pappenheim's testimony that Stephen believed that Jesus was telling Stephen that he did not need mental help.  These findings together cannot support a firm belief or conviction that Stephen was "gravely disabled" for purposes of

---

[24]  *Wetherhorn*, 156 P.3d at 378.  *See also O'Connor*, 422 U.S. at 576 ("In short, a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends."); *see also Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 242 (Alaska 2006) ("Persons are deemed 'gravely disabled' when they are so unable to care for themselves that it seems very likely that they will come to serious harm without help.") (footnote omitted).

[25]  *Wetherhorn*, 156 P.3d at 378 (footnotes and internal quotation marks omitted).

involuntary commitment.[26]

First, as the superior court itself acknowledged, the meaning of Stephen's daughter's comment that he was "creeping [her] out" was unclear. The quote from Stephen's daughter came from Dr. Pappenheim's testimony relaying what Stephen's

---

[26]     The dissent principally argues that we are "substituting [our] judgment for the trial court's" judgment and "re-weighing the evidence." With respect, the dissent misunderstands the applicable standard of review. Our review of whether a superior court's factual findings comport with the legal requirements of AS 47.30 presents a legal question, which we review de novo. *Wetherhorn*, 156 P.3d at 375.

In this case, the ultimate question before the superior court was whether Stephen was gravely disabled as provided and defined in AS 47.30.735(c) (the "court may commit the respondent to a treatment facility . . . if it finds, by clear and convincing evidence, that the respondent is mentally ill and as a result . . . is gravely disabled"), AS 47.30.915(7)(B) (defining "gravely disabled" as "a condition in which a person as a result of mental illness . . . will, if not treated, suffer or continue to suffer severe and abnormal mental, emotional, or physical distress, and this distress is associated with significant impairment of judgment, reason, or behavior causing a substantial deterioration of the person's previous ability to function independently"), and *Wetherhorn*, 156 P.3d at 378 ("in order to be constitutional, AS 47.30.915(7)(B) must be construed so that the 'distress' that justifies commitment refers to a level of incapacity that prevents the person in question from being able to live safely outside of a controlled environment."). The superior court made a number of factual findings, and from these findings reached its ultimate conclusion: Stephen was gravely disabled.

On appeal under a de novo standard of review, it is this court's task to ascertain whether the evidence relied on by the superior court satisfied the requisite legal standards by the mandatory evidentiary burden of clear and convincing evidence. This task demands that we carefully review that evidence to determine whether it satisfies the legal standard. Having done so, we conclude that the evidence before the superior court did not clearly and convincingly establish that Stephen was gravely disabled as defined by AS 47.30.735(c), AS 47.30.915(7)(B), and *Wetherhorn*. We are not substituting our judgment or re-weighing facts found by the trial court; we simply conclude that the evidence the court relied on was insufficient to meet the legal requirements of AS 47.30's standards for "gravely disabled." In other words, we do not re-weigh evidence when we point out that the evidence is insufficient to satisfy the legal standard.

father told Dr. Pappenheim the daughter said to him. Dr. Pappenheim admitted he never directly spoke to Stephen's children and only spoke to Stephen's father. The superior court is certainly not required to ignore this hearsay-upon-hearsay statement, but its reliability and probative value do not meaningfully contribute to the elevated evidentiary burden in this case.

Second, the record and testimony reveal marked differences between Stephen's conduct, behavior, and experience in 2004 — six years before the present commitment hearings — and his conduct, behavior, and experience in 2010, such that the 2004 evidence is insufficient to form the basis for any firm conclusions about Stephen's condition in 2010. As detailed above, both Stephen and Dr. Pappenheim testified concerning the differences between Stephen's experience in 2004 — when he was "extremely fearful" and "knew something was not right" — and his experience in 2010, when he was calm, at peace, and optimistic about the future. Stephen testified that he was in "total fear" in 2004 "when the voices started" and ran to church so someone there could take him to see a doctor because he "didn't want to hurt [anyone]." On direct examination Stephen was asked if he presently felt "any of the types of emotions or [heard] the types of voices" he experienced in 2004 or whether he felt "any pains or . . . internal sufferings" or "physical distress" as in 2004, and Stephen replied "no." On the contrary, Stephen testified that he felt he was "doing good" and he was looking to the future because "[t]hings . . . always work out better."

Moreover, Dr. Pappenheim acknowledged that his conclusions concerning the similarities between the two instances were substantially based on information from Stephen's father that Dr. Pappenheim was unable to corroborate with the medical reports from the Olympia hospital. Dr. Pappenheim recognized that his conclusions about Stephen's condition hearing voices had "a bit of a speculative component to it." When asked if his concern was that Stephen "might eventually act the same way he did five

years ago, even though [Stephen was] not showing signs of similar behaviors," Dr. Pappenheim replied, "[c]orrect." In short, Dr. Pappenheim's speculative conclusions based in part on hearsay evidence gathered solely from Stephen's father provide little support for a finding of gravely disabled by clear and convincing evidence.

Third, while the superior court was entitled to weigh the evidence of Stephen's diagnosis of bipolar disorder in its gravely disabled determination, courts should proceed with caution when relying on mental illness as a basis for involuntary commitment.[27] As the United States Supreme Court explained in *O'Connor v. Donaldson*, the State may not "fence in the harmless mentally ill solely to save its citizens from exposure to those whose ways are different[.]"[28] We have said that "mental illness, without more, 'does not disqualify a person from preferring his home to the comforts of an institution.' "[29] In order to involuntarily commit someone "it is not enough to show that care and treatment of an individual's mental illness would be preferred or beneficial or even in his best interests."[30] Stephen's diagnosis of illness and eligibility for Social Security benefits on the basis of his diagnosis likewise do not contribute much to the elevated burden of proof required in this case to justify commitment.

Fourth, Stephen did not express any general objections to "mental health help," but only to psychotropic medication, particularly because of the side effects that

---

[27] *Id.* at 376 (citing *O'Connor*, 422 U.S. 563 at 575) (mental illness alone is insufficient to form a constitutionally adequate basis for involuntary commitment).

[28] 422 U.S. 563 at 575.

[29] *Wetherhorn*, 156 P.3d at 378 (quoting *O'Connor*, 422 U.S. at 575).

[30] *Id.* (quoting *In re LaBelle*, 728 P.2d 138, 146 (Wash. 1986)) (alterations and internal quotation marks omitted).

he had previously experienced when taking such medication. Stephen stated that he was willing to comply with a court order for involuntary psychotropic medication if the court so decided. A finding of gravely disabled by clear and convincing evidence in this case required the superior court to have a firm belief in the fact that Stephen could not live safely outside of a controlled environment, and had a condition of mental illness that, if left untreated, would cause him to suffer significant impairment of judgment, reason, or behavior. Stephen's willingness to get treatment if the court so ordered demonstrates his ability to reason and make autonomous choices, contrary to the involuntary commitment ordered. Expressing a preference for treatment is not synonymous with refusing all mental help.

In sum, the superior court's decision to commit Stephen was based on partial and unclear evidence, much of which was hearsay, and which the court acknowledged was in tension with significant evidence in favor of Stephen's ability to function independently and live outside of a controlled environment. By contrast, in *In re Jeffrey E.* we upheld the commitment of a respondent who had been in a catatonic state for several days before being restored to a "functioning" condition by means of medication the day before the hearing and who could return to catatonia "in a matter of hours" if he were to stop taking the medication.[31] In that case, there was "no dispute" that the respondent's catatonia "made him gravely disabled, or that catatonia would reoccur shortly after the cessation of medication."[32] Here, on the other hand, Stephen was functioning independently before and during the hearing, and concern that Stephen would decompensate and harm himself at some time in the future was speculative.

The only condition that Dr. Pappenheim identified as a "probability" with

---

[31]     *In re Jeffrey E.*, 281 P.3d 84, 86-88 (Alaska 2012).

[32]     *Id.* at 88.

respect to Stephen was a "deterioration with the development of chronic psychosis."[33] Undoubtedly "chronic psychosis" is a deeply unfortunate condition, but as we have explained, in order to involuntarily commit someone "it is not enough to show that care and treatment of an individual's mental illness would be preferred or beneficial or even in his best interests."[34] Further, as Stephen points out in his brief, if "chronic psychosis" means merely a continuation of his current symptoms, namely a persistent sense that Jesus is speaking to him and telling him to attend church, follow his teachings, and have an optimistic outlook on the future, that condition would in no way compromise Stephen's capacity to function independently or live safely.

Finally, there was much discussion at the January 20 hearing about Stephen's religious background, belief, and practice.[35] Dr. Pappenheim testified that Stephen's religious beliefs were irrational and delusional, principally because they did

---

[33] BLACK'S LAW DICTIONARY defines "chronic" as "of long duration, or characterized by slowly progressive symptoms; deepseated and obstinate, or threatening a long continuance; — distinguished from acute." BLACK'S LAW DICTIONARY 241-42 (6th ed. 1990). Of greater significance, TABER'S CYCLOPEDIC MEDICAL DICTIONARY defines "chronic" as "[d]esignating a disease showing little change or of slow progression. Opposite of acute." TABER'S CYCLOPEDIC MEDICAL DICTIONARY 355 (16th ed. 1989). A condition that is merely chronic without more cannot satisfy the high bar set by the *Wetherhorn* standard, which is chiefly concerned with the severity of the illness, not its duration. *See, e.g.*, *In re Tracy C.*, 249 P.3d 1085, 1094 (Alaska 2011) (affirming an involuntary commitment order when the respondent suffered from an "acute" condition).

[34] *Wetherhorn*, 156 P.3d at 378 (quoting *LaBelle*, 728 P.2d at 146) (alterations omitted).

[35] As we have reiterated on numerous occasions, "[n]o value has a higher place in our constitutional system of government than that of religious freedom." *Sands v. Living Word Fellowship*, 34 P.3d 955, 958 n.11 (Alaska 2001) (alteration in original) (quoting *Frank v. State*, 604 P.2d 1068, 1070 (Alaska 1979)).

not "come from a cultural, historical context" but rather came "out of the blue." The superior court also seemed to regard Stephen's religious background as important, noting that Stephen had not "regularly attended church," although the court also commented that a person's decision "in a time of stress" to find a "religious connection" and to proceed "to an active involvement with God" could not be regarded as "mental illness." In any event, even if Stephen's beliefs did come about suddenly, this should not undermine their validity.[36] More to the point, there was nothing harmful or dangerous about Stephen's religious beliefs or experiences. Stephen testified that Jesus had forgiven his sins and told him to repent and to have a positive outlook on the future, messages that gave Stephen a sense of happiness and relief. Stephen also testified that he began to pray, that he wanted to pray with his children, and that, through his neighbor, he had been put in touch with the pastor of a local Pentecostal church. None of these activities or experiences rendered Stephen gravely disabled or interfered with his ability to live safely outside of a controlled environment.[37]

---

[36] As one court has observed, religious history "is replete with examples of sudden conversions precipitated by crisis, e.g. Saul of Tarsus . . . on the Road to Damascus[,] and by apparently irrelevant events, e.g. Gotama Buddha under the Bohdi Tree." *U.S. v. Jennison*, 402 F.2d 51, 56 n.2 (6th Cir. 1968).

[37] Stephen correctly argues that nothing about his religious experience, practice, or belief "would be out of place in [a] myriad [of] churches across the country," or indeed around the world. Prayer, repentance, forgiveness of sins, and attendance at church are all familiar aspects of Christianity. Less familiar to some observers, perhaps, is the subset of Christianity known as Pentecostalism. Briefly, then, it should be noted that Pentecostals typically "emphasize such spiritually renewing 'gifts of the Holy Spirit' as speaking in tongues, divine healing and prophesying" and, "[e]ven more than other Christians . . . believe that God, acting through the Holy Spirit, continues to play a direct, active role in everyday life." The Pew Forum on Religion & Public Life, *Spirit and Power: A 10-Country Survey of Pentecostals* 3 (2006), *available at* http://www.pewforum.org/files/2006/10/pentecostals-08.pdf. Further, "many

(continued...)

## V.    CONCLUSION

Because the superior court committed error when it found that Stephen was gravely disabled by clear and convincing evidence, we REVERSE the decision of the superior court granting the 30-day commitment order and VACATE the order of commitment.

---

[37]    (...continued)
pentecostals" say they have "received a direct revelation from God," and many also believe in "the intervention of supernatural forces in everyday life," including the activity of "angels and demons . . . in the world." *Id.* at 20, 28.  We note that it is incumbent on courts and the attorneys and mental health professionals who are involved in mental health commitment proceedings to become acquainted with at least the core characteristics of the religious belief systems of respondents when respondents are alleged to be "gravely disabled" because they are engaging in their religious beliefs.

CARPENETI, Chief Justice, with whom FABE, Justice, joins, dissenting.

I disagree with the court's conclusion that an experienced trial judge, who saw and heard the witnesses, committed clear error when she made the factual finding that Stephen O. posed a risk of once again harming himself and therefore committed him to the care and custody of the State for 30 days.

Because I view the facts somewhat differently than today's opinion views them — and I view them more in line with the superior court's view — I begin with a recitation of the salient facts. I then discuss each of the reasons advanced by today's opinion to reverse the superior court's factual finding and show that the court reaches its decision to reverse principally by re-weighing the evidence, in violation of our role as a reviewing court.

*Facts*

In 2004 Stephen O. heard "voices that told him to jump off a wall." He obeyed the voices[1] and, in an apparent suicide attempt, "jumped off a ledge some 16 to 18 feet high." He broke his ankle, gashed his head, sustained a concussion, and was temporarily wheelchair-bound as a result. This incident occurred at a hospital in Olympia, Washington; Stephen had been taken to the hospital by members of a church after he asked them to take him to a doctor. Following this incident, Stephen began receiving Social Security disability benefits for psychiatric illness. He was also prescribed Resperdal, an antipsychotic medication, which he took for approximately one to two years following this psychotic break.

---

[1]     Testimony at the commitment hearing was unclear as to whether Stephen heard the voice of Jesus or the voice of Lucifer.

-25-                                                     6857

In January 2010, Stephen's father became concerned about him again after Stephen's daughter reported that he was "creeping [her] out."[2]  Stephen had begun waking his children up at night and talking to them about God, attending church, and following "a path of repentance."  Stephen's father and daughter were alarmed because this behavior was very similar to Stephen's behavior in his previous psychotic break, where he reported hearing voices and "heading down a path of repentance" and then severely injured himself.  Stephen's mother also considered this behavior to be abnormal because prior to early January 2010 she did not consider him to be a religious person.

Concerned for his safety, Stephen's parents reported his behavior to a community mental health clinician, who filed a petition for initiation of involuntary commitment on January 8, 2010.  The petition identified the following facts that required an evaluation: "Client is presenting with psychotic features including hearing the voice of Jesus.  Client exhibits behaviors similar to those he has exhibited in the past, prior to a suicide attempt."

On January 8, 2010, the Haines Police Department took Stephen into emergency custody under AS 47.30.705(a).[3]  The following day, Master Bruce

---

[2]      Neither Stephen's father nor daughter testified at the hearings in the superior court.  Instead Stephen's father reported his reasons for seeking involuntary commitment to Dr. John Pappenheim, Stephen's treating physician at Bartlett Regional Hospital.

[3]      Alaska Statute 47.30.705(a) provides in relevant part:

> A peace officer, a psychiatrist or physician who is licensed to practice in this state or employed by the federal government, or a clinical psychologist licensed by the state Board of Psychologist and Psychological Associate Examiners who has probable cause to believe that a person is gravely disabled or is suffering from mental illness and is likely to

(continued...)

Horton of the Sitka Superior Court issued an ex parte order to have him taken into custody and transported to Bartlett Regional Hospital in Juneau, "the nearest appropriate evaluation facility," for an evaluation as provided for in AS 47.30.710(a).[4]

Stephen remained in the Haines jail from January 8 to January 14 because bad weather prevented his transportation to Juneau for evaluation. He arrived at Bartlett Regional Hospital on January 14, 2010. He was evaluated the next day by Dr. John Pappenheim, the medical director for psychiatric services. A 30-day commitment hearing was set for January 20, 2010.

*Proceedings*

On January 20, 2010, Superior Court Judge Patricia A. Collins conducted the 30-day commitment hearing. Dr. Pappenheim and Stephen testified regarding the State's request for Stephen's 30-day commitment. The court also considered a report by Elizabeth Ziegler, the court-appointed visitor. On January 27 and 28 the court heard

---

[3]   (...continued)
cause serious harm to self or others of such immediate nature that considerations of safety do not allow initiation of involuntary commitment procedures set out in AS 47.30.700, may cause the person to be taken into custody and delivered to the nearest evaluation facility. A person taken into custody for emergency evaluation may not be placed in a jail or other correctional facility except for protective custody purposes and only while awaiting transportation to a treatment facility.

[4]   Alaska Statute 47.30.710(a) states:

A respondent who is delivered under AS 47.30.700-47.30.705 to an evaluation facility for emergency examination and treatment shall be examined and evaluated as to mental and physical condition by a mental health professional and by a physician within 24 hours after arrival at the facility.

further testimony from Dr. Pappenheim, Stephen, and Ziegler on the State's petition to administer medication.

Dr. Pappenheim gave expert testimony on the diagnosis of Stephen's mental illness and the risks associated with his behavior. He testified that Stephen "suffers from bipolar affective disorder, current manic with psychotic features." Dr. Pappenheim's diagnosis was based "in substantial part" on information he received from Stephen's father regarding his psychotic break six years prior and on interviews he conducted with Stephen. Stephen's father reported that during his prior episode of psychosis, Stephen was behaving "in precisely the same fashion" as in early January 2010: "once again [Stephen was] manifesting the presentation of hearing the voice of Jesus, becoming religiously preoccupied, wanting to head down a path of repentance." Stephen's father had confirmed that his recent change in behavior was a "substantial and marked departure from his previous condition." Dr. Pappenheim was concerned because this departure "has historically been associated with behavior that's very harmful to [Stephen]."

Dr. Pappenheim testified that "[Stephen] has a distinctively and abnormally persistent elevation, or expansiveness[,] of mood that's the singular feature of bipolar disorder." Dr. Pappenheim explained that Stephen's "very elevated . . . if not modestly euphoric mood" was indicative of a problem because it was not congruent with the circumstances of Stephen's unfortunate situation:

> [I]t's this . . . completely illogical, irrational response of everything's great [despite the fact that he's being held against his will, that] his children are no longer with him, and that his father thinks that he has a mental illness that needs to be treated, and that the psychiatrist that's been appointed to work with him thinks that he has a mental illness that needs

to be treated, and that [the psychiatrist] thinks he should take medication and [Stephen] doesn't want to take medication.

Dr. Pappenheim explained further that Stephen was incapable of making a decision about voluntary treatment because he was operating under the belief that he does not have a mental illness.

According to Dr. Pappenheim, Stephen's inability to understand his situation and refusal to accept treatment for it constituted grave disability. Stephen refused to take a mood stabilizer and an antipsychotic, which Dr. Pappenheim believed are "requisite treatment[s]" for someone with manic psychosis. Without treatment, Stephen was at risk of hurting himself as he had during his previous episode of psychosis, because "[p]ast patterns of behavior are really the only good predictors of future behavior." Dr. Pappenheim acknowledged that there were no current allegations that Stephen had failed to care for himself or his children. But, based on the similarity between his current behavior and past episode of psychosis, Dr. Pappenheim explained that Stephen's refusal to accept treatment "places him in substantial danger of deteriorating condition, the development of a chronic psychotic process, [and] the risk of . . . harming himself."

If Stephen were allowed to leave the hospital, Dr. Pappenheim's main concern was that his condition would "persist and worsen, [and] that he would at one point listen to a voice that would tell him to do something very dangerous and self harmful." Dr. Pappenheim characterized Stephen's condition as a significant impairment. He explained that without treatment Stephen's condition was "not going to abate" and "there [would] be a chronic worsening" that may develop into "a chronic psychotic process." Ultimately, Dr. Pappenheim concluded that there was no less restrictive alternative to a 30-day commitment to ensure Stephen's safety and provide him with requisite care.

Stephen also testified at the hearing. He reported on the breakdown of his marriage and recent events in his life. He disputed his family members' reports that he had been behaving abnormally and he disagreed with Dr. Pappenheim's opinion that he was mentally ill.

The court also reviewed a report that outlined Stephen's meeting with Elizabeth Ziegler, the court-appointed visitor. In the report, Ziegler described Stephen as friendly and presenting well. The report noted his description of his previous psychotic break and treatment, and his current objection to taking medication. The report also described his mother's report of his previous psychotic break, and her concerns about his recent religiosity and behavior toward his children.

Acknowledging the "very high burden of proof that applies in this case, . . . clear and convincing evidence," the superior court found that Stephen was "gravely disabled" under AS 47.30.915(7)(B). The court cited the following facts in support of its conclusion: (1) Stephen's prior psychotic break, hospitalization, and apparent suicide attempt; (2) his diagnosis of bipolar affective disorder, current manic with psychotic features; (3) his eligibility for and receipt of Social Security disability benefits for psychiatric condition (eligibility which was based on a "stringent test" administered by Social Security); (4) his daughter's report that he was "creeping [her] out"; (5) his family's concerns about the similarity between his current behavior and his behavior during his prior episode of psychosis; and (6) his belief that Jesus was telling him that he does not need mental health help. The court ordered that Stephen be involuntarily committed for 30 days.

Later, the superior court heard additional testimony on the petition to involuntarily administer psychotropic medication. In the interim, Dr. Pappenheim received records from the hospital in Olympia, Washington, where Stephen was treated during his previous psychotic episode. Dr. Pappenheim testified that the records

strengthened his opinion that Stephen's hospitalization was appropriate "because of the markedly regressed psychotic state that [Stephen] came into . . . and [his] concern that . . . he would return to that at some point."

The superior court denied the petition to administer medication, concluding that there was not clear and convincing evidence that harm to Stephen was imminent because his mental condition had not deteriorated during the time he was in custody. Judge Collins continued the 30-day commitment order finding that Stephen was still gravely disabled, but declined to permit involuntary medication, noting that there was "an even higher burden that has to be met with respect to administration of psychotropic medications."

On January 29, 2010, Stephen was discharged early because the State's petition to involuntarily administer medication was denied, he refused to take medication voluntarily, and "gains [would] not be achieved without medication."

*Discussion*

(1) *The ambiguity of Stephen's daughter's comment*

The first reason advanced by today's opinion to support the conclusion that the trial court committed clear error is that the meaning of Stephen's daughter's comment was "unclear." The precise meaning of a 12-year-old's complaint that her father's actions — waking the child in the middle of the night and talking to her about Jesus and a path of repentance — were "creeping [her] out" may be uncertain, but in context it is certainly a piece of evidence that the superior court is entitled to consider and give weight to. The context — which today's opinion ignores — is that Stephen's actions frightened his daughter: "she remembered . . . what had happened previously and was scared and went to her grandfather and expressed that concern." The majority's handling of this piece of evidence is just the first of many examples of re-weighing of the evidence. But weighing of the evidence is the trial court's function, not ours.

(2)   "[*M*]*arked differences*" *between Stephen's conduct in 2004 and 2010*

The second reason advanced by today's opinion to support the conclusion that the trial court committed clear error were the "marked differences" between Stephen's conduct, behavior, and experiences in 2004 and in 2010.  But it is the court today — an appellate court — which is finding "marked differences" between Stephen's circumstances in 2004 and 2010.  It is not the trial court — which saw the witnesses and heard the evidence — nor is it Stephen's father or daughter.  The trial court relied on the similarity of the situation in 2010 to that in 2004.  Stephen's father characterized his son as behaving in "precisely the same fashion" as he had previously.  Stephen's daughter's actions were characterized this way by the court in her comments to Stephen:

> But for . . . a child that remembers . . . when you had this previous psych[ot]ic break and she almost lost her father to the event that you described on the stand in a way that was sort of chilling.  Where whatever drove you to do it, you . . . took action that could have easily led to your death.
>
> Well, I don't blame a little 12-year-old girl for being real worried.

In short, in making its "marked differences" finding, this court simply re-weighs the evidence,[5] choosing to ignore evidence such as the testimony from Stephen's father that

_____

[5]     The court also seizes on Dr. Pappenheim's statement that his conclusions about Stephen's condition hearing voices had "a bit of a speculative component to it," and then proceeds to refer to the doctor's "speculative conclusions."  In fairness to the psychiatrist, I set out the entire exchange here:

> Q:     [by Stephen's lawyer] [Is there] anything to indicate that he's been hearing the voice of Lucifer?
>
> A:     Well, that's an interesting question.  His father tells me that five years ago he was reporting he was hearing the voice of Jesus.  When I specifically queried [Stephen O.] about

(continued...)

Stephen was behaving "in precisely the same fashion" as his previous psychotic break, and Dr. Pappenheim's testimony that "past patterns of behavior are really the only good predictors of future behavior."

(3)    *Evidence of Stephen's bipolar disorder*

The evidence of Stephen's bipolar disorder is clearly relevant to the superior court's ultimate determination. The superior court did not misuse or overstate this evidence.  That courts should proceed with caution in this area, that evidence of mental illness alone is insufficient for hospitalization, and that treatment might be in a person's best interest but is also insufficient for hospitalization are nowhere challenged by the superior court's action.  The majority's third reason for finding clear error is no reason at all to reverse the trial court.

(4)    *Stephen's non-objection to mental health help*

The court next notes that "Stephen did not express any general objections to 'mental health help,' but only to psychotropic medication."  The basis for this

---

[5]    (...continued)
that, he said, no it was the voice of Lucifer.  Now, he was hearing a voice.  And at some point, it was, according to his father, the voice [of] Jesus.  At some point it turned to the voice of Lucifer.  And I'm certainly concerned that what he's hearing now will not stay as it has been, and may change.

Q:    But that's just speculation, correct?

A:    Well, I think it's a little bit more than speculation.  But there's a speculative component to it, yes.

In the context of these questions and answers, the characterization of Dr. Pappenheim's testimony as self-admitted "speculative conclusions" is inaccurate. More, it suggests that we will require of testifying psychiatrists a type of prescience about the likelihood of a future disaster that would ill serve the interests of both the mentally ill and all Alaskans.

statement is unclear. Stephen objected to both hospitalization and forced medication. He nowhere expressed a general "willingness to get treatment if the court so ordered it," as the court claims. All he said, as reported by the visitor, was that he objected to medication but that "if the court ordered him to take medication he would not harm people and would take an injection." If this is what the court relies on to support its argument regarding "Stephen's willingness to get treatment," it is a slim reed indeed. Stephen not only objected in the superior court to the administration of medication (and won), he believed that he was not mentally ill and objected to any treatment for mental illness, and he appealed the superior court's adverse decision on that issue.

The court then compares the facts of this case to those of *In re Jeffrey E.*, where we upheld a commitment. I agree that *Jeffrey E.* is a stronger case for commitment, but that in no way means that the superior court erred in committing Stephen. And the court misses the holding of *Jeffrey E.*: Alaska Statute 47.30.915(7)(B) is forward-looking in nature and calls upon the superior court to consider the probability that a person suffering from mental illness will deteriorate and harm himself. Here, the court gave great weight to the similarity of Stephen's actions in the previous case (when he harmed himself) and the present case, and it gave great weight to the expert's testimony that past patterns of behavior are the only good predictors of future behavior.

Finally, on the relationship between Stephen's religious beliefs and the superior court's findings, the court both mischaracterizes Dr. Pappenheim's testimony and mistates the superior court's treatment of the issue. The court says Dr. Pappenheim testified that Stephen's beliefs were irrational and delusional "principally because they did not 'come from a cultural, historical context' but rather 'came out of the blue.'" But what Dr. Pappenheim said was this:

> Now, if somebody had a religious belief that they grew up
> with that was part of their culture, that is considered a rational

means for that belief. However, in [Stephen]'s case, the religiosity that he manifested started five years ago *and led him to behave in a way that was substantially dangerous to himself, and could have killed him.*

(Emphasis added.) While Dr. Pappenheim emphasized the recency of Stephen's religiosity, he appears to have relied at least as much on the notion that the voices directed Stephen to throw himself off a building. With regard to the superior court, the majority suggests that the superior court was unduly concerned with Stephen's religious background. But the record shows that both parties had adduced substantial evidence on the subject and that Judge Collins merely made careful findings about it.

*Conclusion*

This was a difficult case. A troubled young man, suffering from mental illness, had a few years previously responded to voices directing him to leap from a building, seriously injuring himself. Again he was hearing voices. His worried family sought to obtain his hospitalization for his benefit and reported that he was behaving "in precisely the same fashion" now as he had in his previous psychotic episode. An experienced trial judge, after hearing from the patient and a psychiatrist who reported the family's concerns, found facts sufficient to support the determination that the patient was gravely disabled. Today's majority reverses that finding by re-weighing the evidence and substituting its judgment for the trial court's and by requiring a predictive capacity that no expert will be able to satisfy. Because I believe that the trial court did not clearly err, I respectfully dissent.